NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0300n.06

No. 25-3817

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JESSIE CANTRELL, Personal Representative of the Estate of Cory Cantrell, | ) ) ) | **FILED** Jul 13, 2026 KELLY L. STEPHENS, Clerk |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| SCIOTO COUNTY, OH, BOARD OF COMMIS-SIONERS, | ) ) ) | COURT FOR THE SOUTH-ERN DISTRICT OF OHIO |
| Defendant, | ) ) | OPINION |
| OFFICER CHRISTOPHER BOGGS, | ) ) | |
| Defendant-Appellant. | ) | |

Before: SUTTON, Chief Judge; BOGGS and RITZ, Circuit Judges.

BOGGS, Circuit Judge. Cory Cantrell died from overdosing on drugs that he purchased from a cellmate while serving a sentence in the Scioto County Jail. Hours before Cory's cellmates noticed Cory unconscious and foaming out of his nose, Officer Christopher Boggs entered Cory's cell, said that Cory looked "f----- up," and asked whether Cory was alright. Cory responded that he was fine. Around that time, Cory was either "acting up" by hitting his cellmates or "nodding out." He may have also manifested a "big goose egg" on his head because of a fall. Officer Boggs took Cory at his word, and neither requested medical treatment nor performed required cell checks to monitor Cory himself.

No clearly established law demonstrates that Officer Boggs should have perceived that Cory faced a serious risk of harm given Cory's insistence that he was fine and the lack of apparent

serious symptoms at that point. We therefore reverse the district court's denial of qualified immunity and Ohio statutory immunity.

**I**

**A**

On June 18, 2022, Cory was serving a ten-month sentence in the Scioto County Jail for a probation violation. After he overdosed multiple times in short succession a couple of months earlier, jail officials housed Cory in a booking-area holding cell ("Cell #5") rather than in the general population. The cell offered several advantages, in theory, to closely monitor Cory's behavior. Large glass windows on the cell's door allowed officers to observe much of the cell even from a distance, and jail policy required officers to perform "personal observation checks"—where officers approach the door and observe every occupant—more frequently than in other parts of the jail. R. 83, PageID 2421.

Cory began the day with three cellmates: Gary Watson, Devin Kritzwiser, and Jerrid Franklin. He gained a fourth that afternoon, briefly but consequentially. Around 5:00 p.m., Perry Steele was booked into the jail and placed in Cell #5. Officer Boggs was on duty in the booking area, working a 3:00 p.m.–11:00 p.m. shift. Another officer, Andy Ness, "conducted all the normal intake search procedures, including a strip search" and an x-ray "body scan," to search for drugs. *Id.* at 2424. Officer Boggs reviewed Steele's body scan along with Officer Ness and did not see "any contraband or anything suspicious" on the scan. R. 64-3, PageID 278. The searches failed to reveal, however, that Steele had smuggled fentanyl into the jail, which Steele promptly sold to Cory. Steele bonded out at 6:27 p.m., leaving Cory with his original cellmates of Watson, Kritzwiser, and Franklin.

Cory consumed the drugs that evening. By about 10:00 p.m., his condition became dire, and his cellmates banged on the door for help. Officers immediately responded and found Cory prone on the floor, breathless and blue in the face, with "copious amounts of what looked like vomit and snot coming out of his nose and mouth." *Id.* at 276–77. Officer Boggs and his colleagues rendered first aid, but their efforts, tragically, did not succeed in saving Cory's life.[1]

The key action for this appeal, however, occurred in the hours preceding Cory's death, when Officer Boggs did—and did not—observe Cory's condition. No surveillance footage survives from before 10 p.m., so the evidence of Cory's overdose symptoms and Officer Boggs's observations of those symptoms derive exclusively from the eyewitness accounts of Cory's cellmates, Watson and Kritzwiser, and of Officer Boggs himself.

Officer Boggs claims that he never noticed any problems with Cory's health until his cellmates banged on their door for help. Before that emergency arose, Officer Boggs does not report entering Cory's cell or conversing with him. Officer Boggs insists, however, that either he or Officer Ness performed personal-observation checks of Cell #5 at 6:30, 7:00, 7:30, 8:00, 8:30, 8:55, and 10:01 p.m. that night.

Watson and Kritzwiser, however, told a different story. In unsworn interviews given to Detective Jodi Conkel in the hours following Cory's death, both cellmates said that officers failed to conduct regular cell checks that evening. And indeed, Officer Boggs's log entries raise suspicions about whether he performed his checks. As the district court noticed, Officers Boggs and Ness "were the only two officers to have such rigid, every-thirty-minutes-on-the-dot, check entries logged in the forty-eight-hour log period that the Jail provided." R. 83, PageID 2425. At least one

---

[1] In the district court, Jessie also brought claims against Officer Boggs and others for failing to use Narcan in their attempt to revive Cory, but the district court dismissed these claims and Jessie did not appeal those judgments.

entry, for 10:01 p.m., appears to contradict surveillance footage that shows jail staff, including Officer Boggs, rendering first aid to Cory at the time. Moreover, even if he logged his checks accurately, Officer Boggs violated the jail's cell-check policy. At a minimum, one of the officers should have performed a check every sixty minutes, but a sixty-six-minute gap separated the 8:55 and 10:01 entries.

Officer Boggs interacted with Cory just once that evening, according to Watson and Kritzwiser, and Officer Boggs did notice that Cory appeared to be intoxicated. Within an hour or so of consuming the fentanyl, Cory "began to 'act up' by hitting cellmates." *Id.* at 2426. A "big goose egg" may even have formed on Cory's head from a fall, though Watson's statement suggests that this did not occur until later in the evening. *Compare* Appellee Br. 3, *with* Watson Interview at 13:00–13:37. Perhaps in response to this commotion, Officer Boggs entered the cell, observed that Cory looked "f----- up," and asked whether Cory was okay. R. 83, PageID 2426. Cory, who according to Kritzwiser was sitting and nodding out when Officer Boggs talked to him, responded that he was fine. Steele had not yet bonded out when this conversation occurred, so it happened before 6:27 p.m., more than three hours before Cory's cellmates would call for help. For most of the evening, Watson and Kritzwiser shared Cory's belief that he would be fine. Only after "lights-out" around 10:00 p.m. did the cellmates notice that Cory had become unconscious and was "foam-ing out the f------ nose." Kritzwiser Interview at 5:30–5:55, 6:43–6:55; *accord* Watson Interview at 16:10–16:45.

B

Jessie, Cory's sister, sued pursuant to 42 U.S.C. § 1983 in the Southern District of Ohio. The operative amended complaint, filed on April 26, 2024, named Officer Boggs in his individual and official capacities as a defendant, along with the county's board of commissioners, various

commissioners in their official capacities, the county sheriff in his individual and official capacities, and several of Officer Boggs's shift-mates in their individual and official capacities. Jessie alleged violations of federal and Ohio law.

Only one federal claim, against one defendant, survived summary judgment: that Officer Boggs violated Cory's Eighth Amendment rights by displaying deliberate indifference to Cory's medical needs in failing to obtain help after conversing with Cory in Cell #5. The district court denied Officer Boggs summary judgment on this claim on the grounds that "there is a genuine dispute of material fact as to whether Defendant Boggs knew Cory was suffering from an overdose and then deliberately ignored Cory's medical needs (largely as a result of the cellmates' video statements)." R. 83, PageID 2445. The district court further denied Officer Boggs qualified immunity based on its brief observation that convicted prisoners have a clearly established right to medical attention "where the circumstances are clearly sufficient to indicate the need" for it. *Id.* at 2457 (quoting *Burwell v. City of Lansing*, 7 F.4th 456, 477 (6th Cir. 2021)). Jessie's parallel Ohio tort-law claim against Officer Boggs survived summary judgment too, and the district court denied Officer Boggs statutory immunity under Ohio Rev. Code § 2744.03(A)(6)(b).

Officer Boggs timely appealed, and Jessie has not cross-appealed the grant of summary judgment to the other defendants.

## II

Although we ordinarily lack jurisdiction to review a denial of summary judgment, the denial of qualified immunity to Officer Boggs falls within the class of collateral orders that are "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Mitchell v. Forsyth*, 472 U.S. 511, 524–25 (1985) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)); *see*

*also* 28 U.S.C. § 1291. Our jurisdiction embraces only "purely legal questions," which can arise under either prong of the qualified-immunity analysis. *Clark v. Louisville-Jefferson Cnty. Metro. Gov't*, 130 F.4th 571, 579–80 (6th Cir. 2025) (per curiam) (quotation omitted).

We have jurisdiction. Understandably, in a case without any video evidence of the relevant events, the record contains some ambiguities about when Cory's various symptoms developed and whether Officer Boggs noticed them. But nothing prevents us from fulfilling our obligation to "'separate' the legal wheat from the factual chaff and proceed." *Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 608 (6th Cir. 2025) (quoting *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995)). Even accepting Jessie's facts and inferences, and even assuming that those facts and inferences find sufficient support in the record, we can answer the purely legal question of whether Officer Boggs's conduct violated Cory's clearly established rights. We can review the denial of statutory immunity under Ohio law for the same reasons. *Heeter v. Bowers*, 99 F.4th 900, 921 (6th Cir. 2024).

**III**

We review the district court's denial of summary judgment, qualified immunity, and state-law statutory immunity de novo. *Id.* at 908, 921; *Griswold v. Trinity Health Mich.*, 175 F.4th 706, 709–10 (6th Cir. 2026). Because Jessie failed to identify any binding precedent that clearly established that Officer Boggs violated Cory's rights, we reverse the district court's judgment.

Qualified immunity protects government officials performing discretionary functions from trial "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We evaluate the constitutional right at a granular level of specificity and evaluate the officer's conduct in light of the case law that existed at the time of his challenged conduct. *See*

*Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). We may address the two elements of qualified immunity—whether the officer violated the plaintiff's right, and whether that right was clearly established—in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, we begin and end with the latter question of whether Officer Boggs's conduct violated clearly established law. Jessie, as the plaintiff, bears the burden of identifying "a case with facts 'similar enough that' it 'squarely governs this one.'" *Moore v. Oakland County*, 126 F.4th 1163, 1167 (6th Cir. 2025) (citation modified). She relies on three cases in an attempt to satisfy this requirement: *Border v. Trumbull County Board of Commissioners*, 414 F. App'x 831 (6th Cir. 2011), *Burwell v. City of Lansing*, 7 F.4th 456 (6th Cir. 2021), and *Hope v. Pelzer*, 536 U.S. 730 (2002). For different reasons, each fails to support her case.

*Border* offers no help to Jessie because we declined to publish that decision. A decision that "doesn't even bind a future panel of this court" cannot put a reasonable officer on notice of an inmate's constitutional rights and the officer's corresponding duties. *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022).

*Burwell* merits more discussion, but is equally unavailing to Jessie's effort to identify on-point precedent placing the "constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (quotation omitted). As in this case, *Burwell* addressed whether various officers should receive qualified immunity when an inmate died from a drug overdose on their watch. There, as here, the plaintiff claimed that the officers violated the Eighth Amendment by "'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Burwell*, 7 F.4th at 462–63 (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2024)). Deliberate-indifference claims comprise two components, the first objective and the second subjective. Objectively, the plaintiff must show

"the existence of a 'sufficiently serious' medical need." *Blackmore*, 390 F.3d at 895 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). This inquiry accounts not only for the severity of the inmate's ultimate condition but also whether the need for medical attention was obvious to laypersons. *See Burwell*, 7 F.4th at 464. Subjectively, the plaintiff must prove that the officer "perceived facts from which to infer substantial risk to the prisoner, . . . did in fact draw the inference, and . . . then disregarded that risk." *Id.* at 466 (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)); *see also Farmer*, 511 U.S. at 837.[2]

We denied qualified immunity for only Officer Brian Kelley, who observed the inmate "unconscious in a pool of his own vomit not just once, but twice," and yet rendered no aid. *Burwell*, 7 F.4th at 472, 476–77. Otherwise, we affirmed the district court's conclusion that four other defendants did not violate the inmate's constitutional rights. Officer Lana Hadzajlic-King did not commit a constitutional violation, for example, even though she failed to investigate after she "could not tell whether [the inmate] was breathing" based on surveillance video that she observed. *Id.* at 468. Neither did Officer Melissa Ouderkirk, who failed to notice that "a pool of vomit had formed around [the inmate's] head" when she conducted a cell check. *Id.* at 470. We noted the "irony that Ouderkirk's admitted violation of the jail's cell check policy excuses her from liability because she never witnessed [the inmate] in medical distress," but deliberate indifference requires proof that the officer *knew* of the inmate's serious condition, not merely that she *should have* known of the condition. *Id.* at 471.

Officer Boggs never observed the extreme degree of symptoms that Officer Kelley noticed yet ignored. Cory's worst symptoms—unconsciousness and emitting fluids from his mouth and

---

[2] The inmate in *Burwell* was a pretrial detainee, but at the time we applied the same framework to those Fourteenth Amendment claims as we apply to claims brought on behalf of convicted prisoners under the Eighth Amendment. *See* 7 F.4th at 463.

nose—did not begin until sometime between lights-out, around 9:30 p.m., and the cellmates' call for help around 10:00 p.m. Officer Boggs never observed Cory during this period. When Officer Boggs *did* see Cory earlier that evening, he noticed, at worst, an inmate scuffling with his cellmates, falling down, nodding out, and with a "big goose egg" on his head. *See* Appellee Br. 3. Cory himself even said that he was fine.

None of this approximates an unconscious inmate lying in his own vomit. Nothing in *Burwell* suggests that Officer Boggs should have interpreted Cory's symptoms as a medical emergency as opposed to ordinary intoxication, a common reality of jail life. *See Griswold*, 175 F.4th at 712–13 (holding that *Burwell* did not clearly establish that officers violate the Constitution when they failed to provide medical treatment for an inmate who vomited once, refused aid, and "remained sitting in his vomit for nearly 13 hours," making "minor movements" throughout that time). Nor does *Burwell* support subjecting Officer Boggs to trial for failing to perform proper cell checks. As our discussion of Officer Ouderkirk shows, a failure to perform required cell checks may show negligence, but often weakens rather than supports an argument for deliberate indifference. *Burwell*, 7 F.4th at 470–71. Such is the case here, where Officer Boggs's failure to perform cell checks regularly prevented him from observing the worst of Cory's symptoms. Far from helping Jessie to bear her burden of providing clearly established law, *Burwell* undermines her case.

*Hope*, a case involving a shirtless inmate handcuffed above shoulder height to a hitching post for seven hours in the Alabama sun, 536 U.S. at 733–35, cannot salvage Jessie's claim. Occasionally, a constitutional violation may be so "obvious" as to overcome qualified immunity even without a precedent exactly on point, *id.* at 741, but such cases are "rare," *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018). This is not one of them. Our cases recognize the fine line between

symptoms of intoxication and symptoms of a deadly overdose. *See, e.g.*, *Blaine v. Louisville Metro Gov't*, 768 F. App'x 515, 525 (6th Cir. 2019); *Hinneburg v. Miron*, 676 F. App'x 483, 487–88 (6th Cir. 2017); *Smith v. Erie Cnty. Sheriff's Dep't*, 603 F. App'x 414, 420–21 (6th Cir. 2015). The symptoms that Officer Boggs observed when he checked on Cory did not put him on clear notice that Cory's condition triggered his duty to act. *See Hope*, 536 U.S. at 741.

In sum, Jessie failed to produce any binding precedent that clearly established the illegality of Officer Boggs's initial response to Cory's symptoms. Officer Boggs is therefore entitled to qualified immunity on Jessie's Eighth Amendment claim. And because the standard for statutory immunity under Ohio law "overlaps" with the federal standard for qualified immunity under federal law, Officer Boggs is likewise entitled to immunity from Jessie's state-law claim. *Heeter*, 99 F.4th at 922.

## IV

We **REVERSE** the district court's denial of qualified immunity to Officer Boggs and **REMAND** for entry of summary judgment in his favor on Jessie's Eighth Amendment and state-law tort claims.